## LUFFMAN *v.* THE STATE.

1. Under the law as applied to the facts in evidence, the attempt by the accused to arrest the deceased was unlawful.
2. The evidence and the statement of the accused authorized a finding that the accused was the original aggressor, and that he committed the homicide to prevent an assault by the deceased, in resistance of an unlawful arrest, that was not disproportionate to the assault committed by the accused in attempting to make such arrest.
3. Where nothing other than the statement of the accused tended to show that the deceased was the aggressor and was making an attack on the accused, testimony offered by him to prove that the deceased was a man of violent character was properly rejected.
4. The evidence authorized the conviction of murder.

No. 6296. APRIL 14, 1928. REHEARING DENIED MAY 19, 1928.

Murder. Before Judge Pittman. Gordon superior court. October 8, 1927.

E. R. Luffman was indicted for the murder of Kyle Lee Arwood. The evidence introduced by the State tended to show that the defendant, a bailiff in Gordon County, attempted to arrest the deceased in Gordon County without a warrant; that the deceased demanded to know by what authority the arrest was made, to which the defendant replied that he did not have a warrant, but that a warrant had been issued in Whitfield County for his arrest, and that he had orders to arrest him; that the deceased refused to be arrested without exhibition of a warrant. The defendant took hold of the deceased by the arm and drew his pistol, and the deceased still resisted, after which the defendant again drew his pistol and shot the deceased inflicting the wound from which he died. The accused was convicted, with a recommendation to mercy. He excepted to the refusal of a new trial.

The tenth ground of the motion for new trial sets out certain parts of the evidence and of the defendant's statement before the jury, as follows: "Witness Deck being on the stand, question by Mr. Lang: 'What, if anything, did you tell the defendant as to

deceased's character, and as to him being a dope fiend, and his reputation for violence?' Court: 'Leave that out until some overt act on the part of the deceased is shown. The Supreme Court has held that it is just as much a crime to kill a big man and a violent man as it is a little man or a peaceable man.' Mr. Lang: 'Your honor, we contend that we have already shown an overt act on the part of the deceased toward the defendant, and we are just about to show a communication of the fact of deceased's violent and turbulent character, a warning to the defendant of the fact that it was necessary to watch the deceased, that he was a dangerous man, a violent and turbulent character. We will show that that was communicated to him then.' Court: 'Until some overt act of violence is shown by the deceased to the defendant, whether he was violent or whether he was peaceable would be immaterial.' The evidence referred to which had been admitted and was then before the jury, which movant insists authorized the admission of such evidence rejected by the court, is as follows, to wit: Britt Davis, witness for the State, on cross-examination, had testified, among other things: 'They [the deceased and defendant], stood there and scuffled something like five or ten minutes before the shooting took place, I expect, something like that.' W. J. Silvers, witness for the State, on cross-examination had testified, among other things: 'After Mr. Luffman took hold of him [deceased], they stood there ahold of each other and arguing for just a few minutes before the shooting took place; it wasn't ten minutes, wasn't over five minutes.' Charley Deck, witness for the defendant, had testified, among other things: 'I told Kyle Lee [deceased] that if I was him I wouldn't resist that man. . . I says, "I would [not] act a fool and get into trouble. I would just submit and go on with him." Kyle Lee said he be God-damned if he would do it. Mr. Luffman had his pistol in his left hand, and Arwood says: "If you don't put that God-damned thing up, I will take it away from you and beat your God-damned brains out." Arwood was standing kind of in this manner, and just as he said that he set that foot up [indicating]. . . Arwood says, "If you don't put that God-damned thing up, I will take it away from you and beat your brains out," and he gripped his fist, and pushed his foot out toward Luffman; they were not further apart than that [illustrating], and Luffman had his pistol in his left hand, and

just as he said what I have testified, and set his foot out, Luffman plugged him [witness illustrating position and movement of parties], just like that.

"The defendant in his statement had said: 'Well, on this particular occasion Mr. Dick come down there and told me . . that he wanted me to arrest this man; said they wanted him in Dalton very bad, and said there was a warrant for him for stealing a forty-five Colt's automatic pistol; and he said if we didn't get hold of him he was liable to get away to Tennessee; says, "I want to catch him here," says, "If he comes here I want you to be sure and take him up for me." He said that he had passed him out here on the road. He informed me that he had a warrant for him, he said he had a warrant for him for stealing that pistol; and when he come up there he come in a car with somebody. I don't know who he was in the car with, some fellow that went toward Sonoraville, and Mr. Arwood got out of the car, and Mr. Deck says "There is that boy now that got out of that car," and says, "He has stopped here." . . I approached the man just as nice as I could, as I commonly do, to arrest him, and he says, "Have you got a warrant for me?" I told him "No sir." I says, "I ain't got a warrant, but Mr. Deck has," and he said, "You God-damned old gray-headed son of a bitch, I won't go nowhere with you at all under no circumstances," and he just proceeded to push me back. I took hold of him and told him there wasn't no use of doing that. I says, "I want to treat you right, I have always treated or tried to treat everybody right, and I want you to come ahead and see what it is all about; they say they have a warrant for you," and he give me a shove, and caught hold of me and creened me over, and pushed me back, and when he done that I drew my pistol out in my left hand. I never did take my left hand up then no way, I brought my left hand straight across that way [illustrating]; it was about that high [illustrating], and I didn't have it pointed toward him at all. "Well," he says, "if you will put up that old pistol back in your pocket I will go with you, I won't resist any further, I will go with you if you will put it back in your pocket," and I told him I would do that, that that was all I wanted, "I want you to go back to court with me," and I dropped the pistol right back down in my pocket, and he told me then, he says, "You couldn't hurt me with that God-damned little popgun if you was

to shoot me with it," and he says, "You get it out here any more, I will take it away from you and beat your God-damned brains out with it right now, you old gray-headed son of a bitch." He called me that I guess twenty-five times. He was right over me, and he just reached down and grabbed the pistol that way in his hand [illustrating], and so I couldn't deal with him at all, and if I had let him have one more pull he would have got it away from me, and when he pulled it up on my body I pulled it off, and if I hadn't done it he would have killed me that quick. I didn't have no time promised me at all if I had let him have that pistol; he just kept on calling me an old gray-headed son of a bitch, he called me that twenty-five times, I guess, and I never had had that kind of a record with anybody and I didn't want to have. When he shoved me back and grabbed the pistol he would have wrung it out of my hand; he was man enough to have got it all right, and if I had let him get it he sure would have killed me right there. That was what he aimed to do, he told me he aimed to do that, and he aimed to do it, there ain't no two or three ways about that. Mr. Deck told me this, he says, "We have got a warrant for him for stealing a pistol; you keep a watchout for him, for he has got that on him, I guess," says "I guess that he has got that pistol that he stole on him," but if he had any pistol I never saw it at all; he just commenced trying to get my pistol; he grabbed the barrel of my pistol in his hand and throwed it down, and then when he grabbed the barrel of the pistol in his hand he pulled it up, and he wrung it, trying to wring it out of my hand, and when he pulled it up on him pulling on it I didn't know anything else to do. I knowed good and well if I didn't he would kill me, and he wouldn't be two minutes about it; I knowed that. That was his intentions. I feel like I never done any more than any other man would have done defending himself and taking care of himself. That is the proposition as I look at it. I believe any other intelligent man would have took care of himself just like I did. I didn't feel like I was ready to die yet. I knowed, I saw that he was far superior in strength to me. I saw that if he had got me, and he tried two or three different times to throw me over, and says, "I will just take your pistol away from you and stomp your God-damned brains out, or beat them out with the pistol," and he told me if I would put it up he would go with

me, and I did put it up, and he says, "If you get that pistol back out here any more I will take it away from you and beat your damned brains out," and he proceeded to get it; he caught hold of the barrel of it in his hand. I don't feel like, gentlemen, I have done anything any more than any other sensible man would have done under the circumstances and conditions.' "

*F. A. Cantrell* and *J. M. Lang,* for plaintiff in error.

*George M. Napier, attorney-general, John C. Mitchell, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

HILL, J. 1. In *Adams* v. *State,* 121 *Ga.* 163 (3) (48 S. E. 910), it was held: "Where the circumstances are such that a lawful arrest can not be made except under warrant, the warrant must, at the time of making the arrest, be in the possession of the arresting officer, or of another in the neighborhood with whom he is acting in concert. For the purpose of making an arrest, a warrant is not in the possession of the officer when it is in his house some distance from the scene of the arrest." The evidence in this case tended to show that a warrant was issued by a justice of the peace in Whitfield County, for the arrest of the deceased; that subsequently the justice of the peace, while at Resaca in Gordon County, seeing the deceased, informed the defendant, who was a bailiff in Gordon County, of the existence of the warrant, and requested him to arrest the deceased. At the time of the request the justice of the peace did not have the warrant, nor was it ever delivered to the defendant to be executed. Nevertheless the defendant proceeded to arrest without the warrant. The latter resisted arrest on the ground that the arresting officer did not comply with his demand for exhibition of a warrant. In the controversy that ensued the officer shot and killed the deceased. Under application of the principle stated above, the attempted arrest was unlawful. There was no evidence to authorize a finding that the arrest was for an offense committed in the presence of the officer, or that the deceased was attempting to escape, or for other cause there was likely to be a failure of justice for want of an officer to issue a warrant.

2. If an officer attempting to make an unlawful arrest proceeds so far that his act would amount to an assault, the person sought to be arrested may resist the assault with force proportionate with the attack made upon him; but if the resistance exceeds the

force necessary to prevent the illegal arrest, and amounts to a felonious assault upon the officer, the latter may resist such felonious assault to the extent of taking the life of the assailant, if that amount of resistance be necessary to prevent the attempted injury. *Coleman* v. *State,* 121 *Ga.* 594 (49 S. E. 716), and cit.; *Shubert* v. *State,* 127 *Ga.* 42 (55 S. E. 1045). The evidence and the prisoner's statement, as set out in the tenth ground of the motion for new trial, was sufficient to authorize a finding that the defendant, who was originally the aggressor, slew the deceased to prevent an assault upon the accused that was not disproportionate to the assault committed by him on the deceased in attempting to make the illegal arrest.

3. In making his statement to the jury, as provided for by statute, the prisoner can not lay the foundation for introducing in his favor evidence that would otherwise be inadmissible. Thus, where there was nothing to show that at the time of the homicide, with the commission of which the defendant was charged, the decedent was the aggressor and was making an attack upon the accused, except the statement of the accused to that effect, evidence offered by him to prove that the decedent was a man of violent character was properly rejected. *Chapman* v. *State,* 155 *Ga.* 393 (117 S. E. 321); *Medlin* v. *State,* 149 *Ga.* 23 (98 S. E. 551).

4. The evidence authorized the verdict, and the court did not err in refusing a new trial.

　　　　　*Judgment affirmed. All the Justices concur, except*

ATKINSON and HINES, JJ., dissenting. Omitting all reference to the prisoner's statement, the testimony of the witness Deck was sufficient to authorize introduction of evidence as to the character of the deceased for violence, and the rejection of evidence of that kind was cause for reversal after judgment refusing a new trial.